# Exhibit A

FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

OCT 18 2005
OCT 18, 2005
Judge David H. Coar
United States District Court

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| vs. | ) |
| | ) |
| RODNEY BEW | ) |

No.04 CR 253-1
Judge David C. Coar

## PLEA AGREEMENT

This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and the defendant, RODNEY BEW, and his attorney, GARETH MORRIS, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed, in part, by Federal Rule of Criminal Procedure 11(c)(1)(C) as set forth below in Paragraph 18.

This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and the defendant regarding the defendant's criminal liability in case 04 CR 253-1.

This Plea Agreement concerns criminal liability only, and nothing herein shall limit or in any way waive or release any administrative or judicial civil claim, demand or cause of action, whatsoever, of the United States or its agencies. Moreover, this Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities except as expressly set forth in this Agreement.

By this Plea Agreement, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and the defendant, RODNEY BEW, and his attorney, GARETH MORRIS, have agreed upon the following:

1.     Defendant acknowledges that he has been charged in a second superseding indictment in this case with the following offenses: conspiracy to possess with intent to distribute and to distribute controlled substances, namely, in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine, and in excess of 500 grams of mixtures containing cocaine, which are both Schedule II Narcotic Drug Controlled Substances, in violation of Title 21, United States Code, Section 846 (Count 1); one count of possession with intent to distribute in excess of fifty grams of mixtures containing cocaine base in the form of crack cocaine, in violation of Title 21, United States Code, Section 841(a)(1) (Count 2); sixteen counts of using a telecommunications facility in committing and in causing and facilitating the conspiracy charged in Count One, in violation of Title 21, United States Code, Section 843(b) (Counts 3, 4, 5, 6, 7, 9, 10, 11, 13, 16, 17, 18, 21, 24, 26, and 27); four counts of possession with intent to distribute approximately 500 grams of mixtures containing cocaine, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2 (Counts 8, 14, 19, and 29); one count of possession of a firearm by a felon in violation of Title 18, United States Code, Section 922(g)(1) (Count 12); and one count of possession with intent to distribute approximately 9 ounces of mixtures containing

2

cocaine, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United

States Code, Section 2 (Count 22).

2.    Defendant has read the charges against him contained in the second

superseding indictment, and those charges have been fully explained to him by his attorney.

3.    Defendant fully understands the nature and elements of the crimes with which

he has been charged.

4.    Defendant will enter a voluntary plea of guilty to Count One of the second

superseding indictment.

5.    Defendant will plead guilty because he is in fact guilty of the charge contained

in Count One of the second superseding indictment. In pleading guilty, defendant admits the

following facts and that those facts establish his guilt beyond a reasonable doubt and provide

a basis for the forfeiture of the property described in paragraph 19 below:

From in or about January 2000, to in or about March 2004, at Chicago, Joliet, and

Lockport, in the Northern District of Illinois, Eastern Division, the defendant RODNEY

BEW conspired with Alfonso Perez, Ruben Bew, Robert Lee Knox, Brian Johnson, William

McEachins, William Fuller, Donald Pesavento, Joshua Betts, and others known and unknown

to the Grand Jury, to knowingly and intentionally possess with the intent to distribute and to

distribute controlled substances, namely, in excess of 50 grams of mixtures containing

cocaine base in the form of crack cocaine (hereinafter "crack cocaine"), and in excess of 500

3

grams of mixtures containing cocaine, which are both Schedule II Narcotic Drug Controlled

Substances, in violation of Title 21, United States Code, Section 846.

From in or about January 2000, to in or about March 2004, William McEachins

introduced RODNEY BEW to approximately four cocaine suppliers.    In exchange,

RODNEY BEW paid McEachins a fee that usually ranged between $50 and $500.  In or

about May 2003, RODNEY BEW agreed to pay McEachins $500 in exchange for his help

in locating a new powder cocaine supplier. RODNEY BEW spoke with McEachins over the

phone in order to arrange for the purchase of one kilogram of cocaine, negotiate its price, and

arrange the date, time, and location of the purchase. McEachins introduced RODNEY BEW

to Alfonso Perez, and thereafter, RODNEY BEW began to purchase powder cocaine from

Perez on a regular basis. RODNEY BEW cooked the powder cocaine into crack cocaine and

distributed it to other members of the conspiracy as well as to individual customers.

From in or about 2000, to in or about 2004, RODNEY BEW and Ruben Bew pooled

their money together for the purpose of purchasing kilograms of cocaine from the various

suppliers introduced to RODNEY BEW by William McEachins.  On occasion, RODNEY

BEW borrowed money from Ruben Bew to purchase powder cocaine which he would then

cook into crack cocaine. RODNEY BEW repaid Ruben Bew after he sold the crack cocaine.

Throughout this time period, if RODNEY BEW ran out of crack cocaine, he would borrow

some crack cocaine from Ruben Bew and sell it.  From in or about March 2003, to in or

about November 2003, RODNEY BEW and Ruben Bew met Alfonso Perez on at least five

4

occasions and purchased cocaine in quantities ranging from 1/4 ounce to 1 kilogram. On at least two occasions, Ruben Bew paid Brian Johnson an 8-ball [3.5 gram quantity] of powder cocaine to accompany RODNEY BEW and Ruben Bew when they met with Alfonso Perez.

From in or about 2001, to in or about 2004, RODNEY BEW sold crack cocaine in amounts ranging from $10 to $140 to Donald Pesavento at least every other day. Approximately 10% to 20% of the time, Brian Johnson delivered the crack cocaine to Pesavento on behalf of RODNEY BEW. During this time period, Pesavento regularly introduced new crack cocaine customers to RODNEY BEW. The new customers often became RODNEY BEW's regular crack cocaine customers. Pesavento also acted as a middleman between customers and RODNEY BEW during the drug transactions. On occasion, RODNEY BEW sold Pesavento crack cocaine at a discounted price based upon their longstanding narcotics relationship.

From in or about March 2003, to in or about November 2003, RODNEY BEW purchased powder cocaine, in quantities ranging from a quarter ounce to 1 kilogram, from Alfonso Perez once or twice a week. RODNEY BEW cooked the cocaine into crack cocaine so he could sell it. RODNEY BEW would often gather money from other members of the conspiracy in order to purchase powder cocaine from Perez for approximately $21,000 per kilogram. Perez often "fronted" powder cocaine to RODNEY BEW by accepting only a portion of the purchase price with the understanding that RODNEY BEW would pay the remainder at a later date.

5

From in or about March 2003, to in or about December 2003, RODNEY BEW sold crack cocaine to William Fuller. During this time, RODNEY BEW routinely fronted between two-and-a-quarter ounces to four-and-a-half ounces of crack cocaine to Fuller each week. RODNEY BEW was paid for the crack cocaine after Fuller successfully sold the crack to his own customers. In addition, RODNEY BEW used Fuller as an alternate source of supply of crack cocaine in the event that RODNEY BEW was short on his own supply.

In or about April 2003, RODNEY BEW fronted Robert Lee Knox two-and-a-quarter ounces of crack cocaine and received payment after Knox sold the crack cocaine. Following that transaction, RODNEY BEW and Knox began to deal with each other on a regular basis. At the beginning of their relationship, RODNEY BEW distributed on average approximately 63 grams of crack cocaine per week to Knox. Knox paid RODNEY BEW when he sold the crack cocaine. From in or about April 2003, to in or about September 2003, the quantity of crack cocaine RODNEY BEW distributed to Knox increased to two-and-a-quarter ounces of crack cocaine at least twice a week. Knox likewise sold the crack cocaine to his customers. Knox also loaned money to RODNEY BEW with the understanding that RODNEY BEW would purchase powder cocaine and cook it into crack cocaine for Knox. In addition, on at least ten to fifteen occasions during this time period, Knox gave RODNEY BEW money so he could buy powder cocaine from Alfonso Perez. On at least three or four occasions, Knox went with Rodney Bew to meet Alfonso Perez. Knox communicated with RODNEY BEW by telephone to arrange the purchase of both powder cocaine and crack

6

cocaine, negotiate the price of crack cocaine, and arrange the date and time of the narcotics transactions.

In or about May 2003, RODNEY BEW offered Brian Johnson a place to stay in Lockport, Illinois, at no cost. In exchange, the two agreed that Johnson would deliver bags of crack cocaine to customers who RODNEY BEW directed to the house. RODNEY BEW paid Johnson for his services by giving him 8-balls of both powder and crack cocaine. From in or about May 2003 to in or about August 2003, Johnson worked for RODNEY BEW selling bags of crack cocaine on an average of fifteen to twenty bags a week at prices ranging from $20, $50, and $100. On occasion, Johnson cooked powder cocaine into crack cocaine for Rodney Bew, but in general, Rodney Bew preferred to cook the cocaine himself because he had his own special way of cooking powder cocaine. During this time frame, Johnson acted a "driver" for RODNEY BEW by driving a separate car when RODNEY BEW met with Perez. Johnson would take the cocaine in his car and RODNEY BEW would follow him in another car back to Joliet. They did this so RODNEY BEW would not be caught with the cocaine by law enforcement. RODNEY BEW also employed other drivers for this task. RODNEY BEW also directed Johnson to deliver payments to Perez from RODNEY BEW for prior cocaine purchases. Perez also delivered quantities of cocaine to Brian Johnson who was acting on behalf of RODNEY BEW.

From in or about June 2003, to in or about March 2004, RODNEY BEW used Joshua Betts acted as an alternate source of crack cocaine for his customers. In or about July 2003, RODNEY BEW referred Customer A to Betts when RODNEY BEW was out of town and

7

unavailable to sell crack cocaine to Customer A. At the direction of RODNEY BEW, Betts sold crack cocaine to Customer A on at least four occasions in $20 and $30 quantities. Following this initial introduction, whenever RODNEY BEW did not have crack cocaine to sell, he would refer Customer A to Betts. On at least five or six occasions during a period when RODNEY BEW was unavailable, RODNEY BEW referred Robert Lee Knox to Betts so that Knox could purchase 8-balls of crack cocaine.

On or about February 11, 2003, RODNEY BEW distributed approximately 61.4 grams of crack cocaine to Individual A in exchange for $1,500.

On or about May 29, 2003, RODNEY BEW, Ruben Bew, Brian Johnson and two other individuals met with Alfonso Perez in Chicago and received one kilogram of powder cocaine in exchange for approximately $21,000. RODNEY BEW and Ruben Bew combined their money with the intention of splitting the kilogram. RODNEY BEW purchased the powder cocaine for the purpose of cooking it into crack cocaine for sale to others. On May 31, 2003, RODNEY BEW paid McEachins cash as payment for arranging introductions to the one kilogram cocaine deal that occurred on May 29, 2003, and for introducing RODNEY BEW to Alfonso Perez.

On or about June 5, 2003, at Lockport, Illinois, RODNEY BEW knowingly possessed a Lorcin, Model L380, semi-automatic, .380 caliber handgun, bearing serial number 355976. On that date, following an arrest by law enforcement, RODNEY BEW called Ruben Bew, directed him to go to a couch in RODNEY BEW's home in Lockport, Illinois, with the intent that Ruben Bew would get rid of the gun hidden there. RODNEY BEW did this in an

8

attempt to prevent law enforcement from finding the gun. RODNEY BEW kept the gun at the Lockport address for the purpose of security for his use and for use by Brian Johnson, who lived at house in Lockport.

On or about June 25, 2003, following a series of telephone conversations, RODNEY BEW negotiated the purchase of a kilogram of cocaine on behalf of Michael Hatten-Lubick from Alfonso Perez. On that date, RODNEY BEW together with Hatten-Lubick met Perez and RODNEY BEW paid Perez approximately $21,000, provided by Hatten-Lubick, in exchange for a kilogram of cocaine.

On or about July 27, 2003, RODNEY BEW called Alfonso Perez in order to discuss the purchase price of a quarter- kilogram, or nine ounces, of cocaine. The two negotiated a price and later that day, RODNEY BEW met with Perez and paid him approximately $6,000 in exchange for a half- kilogram of cocaine. Perez allowed RODNEY BEW to owe him $4,000 of the purchase price based on their prior narcotics transactions.

On or about June 29, 2003, RODNEY BEW purchased approximately nine ounces of cocaine from Alfonso Perez for Robert Lee Knox. On that date, RODNEY BEW, Knox and Brian Johnson met with Perez and RODNEY BEW paid Perez approximately $5,500 in exchange for the nine ounces of cocaine.

On or about July 16, 2003, RODNEY BEW negotiated the purchase of a kilogram of cocaine from Alfonso Perez on behalf of Michael Hatten-Lubick and Isaac Norfleet. On that date, RODNEY BEW traveled to Chicago in one vehicle and Hatten-Lubick and Norfleet followed in a second vehicle. The three then met Perez at a Burger King in

9

Chicago. Perez then got into RODNEY BEW's vehicle and instructed him to drive to the alley behind Perez's home to his garage where Perez said he was storing the kilogram. Hatten-Lubick and Norfleet followed RODNEY BEW and Perez to the garage. Perez went into his garage, returned with a bag which contained a kilogram of cocaine, and gave it to RODNEY BEW, who in turn gave it to Hatten-Lubick and Norfleet. In exchange for the kilogram of cocaine, RODNEY BEW paid Perez the cash he had received from Hatten-Lubick.

During this time period, RODNEY BEW communicated by telephone with other members of the conspiracy to arrange the purchase of powder and crack cocaine, negotiate the price of powder and crack cocaine, and arrange the date and time of the narcotics transactions.

6.     Defendant RODNEY BEW also acknowledges that, for the purpose of computing his sentence under the United States Sentencing Guidelines, the following conduct, to which he stipulates, constitutes relevant conduct under Guideline §1B1.3:

From in or about 2000 to in or about 2004, RODNEY BEW introduced Michael Hatten-Lubick to various cocaine suppliers. In exchange, Hatten-Lubick paid RODNEY BEW approximately $1,000 for every completed purchase. RODNEY BEW brokered deals between Hatten-Lubick and different cocaine suppliers on at least twenty occasions during this time period. RODNEY BEW communicated by telephone with Hatten-Lubick in order to arrange for the purchase of one kilogram of cocaine, negotiate the price of the kilogram of cocaine, and arrange the date, time, and location of the purchase.

10

On at least two occasions in or about 2003, RODNEY BEW, accompanied by Brian Johnson, acted as a broker between Hatten-Lubick and Perez for the purchase of kilograms of powder cocaine. In addition, on at least two or three occasions in or about August 2003, RODNEY BEW, accompanied by Robert Lee Knox, acted as a broker between Hatten-Lubick and Perez in order to purchase kilograms of powder cocaine. On occasion, RODNEY BEW and Hatten-Lubick split the cocaine in order to sell it for profit for themselves.

The information in paragraphs 5 and 6 is provided only for the purpose of establishing a factual basis for the defendant's plea of guilty and relevant conduct. It is only a summary of the information known to defendant regarding his activities, and it does not contain all the information known to defendant concerning persons and events described above.

7.    Defendant understands that, in imposing the sentence, the Court will be guided by the United States Sentencing Guidelines. The defendant understands that the Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

8.    The calculations listed below to determine the advisory Sentencing Guidelines range are governed by the guidelines effective November 2004 promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994. The parties agree and disagree on the following points:

(a)    The amount of narcotics involved in the offense of conviction and relevant conduct for which the defendant is accountable is 1.5 kilograms or more of cocaine base and

11

at least 15 kilograms but less than 50 kilograms of powder cocaine, and therefore, pursuant to Guideline §2D1.1(c)(1), the base offense level is level 38.

(b)    The parties agree that a dangerous weapon was possessed, and therefore, pursuant to Guidelines §2D1.1(b)(1), the offense level is increased two levels.

(c)    The parties agree that the defendant was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive, and therefore, pursuant to Guideline § 3B1.1(b), the offense level is increased three levels.

(d)    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if the defendant continues to accept responsibility for his actions, within the meaning of Guidelines § 3E1.1, a two-level reduction in the offense level is appropriate.

(e)    Defendant timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently, within the meaning of Guideline §3E1.1(b). Accordingly, at the time of defendant's sentencing hearing, the government will move for an additional one-level reduction in the offense level, provided the Court determines the offense level to be 16 or greater prior to the operation of Guideline § 3E1.1(a).

(f)    It is the government's position, based on the information currently available to the government, that the defendant has the following criminal history:

i.    On or about July 23, 1993, defendant was convicted in Will County, Illinois, of unlawful delivery of a controlled substance (count 1), unlawful use of a

12

weapon (count 2), and unauthorized use of food stamps (count 3) in case number 92 CF 3395, and sentenced to 2 years probation. In 1996, the defendant's probation was revoked and he was sentenced to concurrent terms of 4 years imprisonment (count 1), 2 years imprisonment (count 2), and 1 year imprisonment (count 3). Pursuant to Sentencing Guideline § 4A1.1(a), the defendant receives 3 criminal history points for this conviction.

ii.     On or about January 10, 2000, defendant was convicted in Will County, Illinois, of two counts of aggravated battery in case number 96 CF 4189 and sentenced to 18 months conditional discharge and 180 days imprisonment. Pursuant to Sentencing Guideline § 4A1.1(b), the defendant receives 2 criminal history points for this conviction.

iii.    On or about January 10, 2000, defendant was convicted in Will County, Illinois, of aggravated battery in case number 95 CF 7020, and sentenced to 18 months conditional discharge and 180 days imprisonment. Pursuant to Sentencing Guideline § 4A1.1(b), the defendant receives 2 criminal history points for this conviction. Pursuant to Sentencing Guideline § 4A1.2(a)(2), this sentence is not related to the sentence imposed in case number 96 CF 7020 because the two felony offenses were separated by an intervening arrest.

iv.     Pursuant to Sentencing Guideline § 4A1.1(e), the defendant receives 2 criminal history points because he committed the instant offense less than 2 years after release from imprisonment on a sentence counted under Sentencing Guideline § 4A1.1(a) or (b), namely the term of imprisonment in case numbers 95 CF 720 and 96 CF 4189.

(g)     The government maintains that, pursuant to Sentencing Guideline §4B1.1 (a), defendant is a career offender because he was at least 18 years old at the time he committed the instant offense, the instant offense was a controlled substance offense, and defendant has a prior felony conviction for a controlled substance offense, and two prior felony convictions for crimes of violence, namely the convictions described in paragraph 8(e)(i), (ii), and (iii). The defendant contends that he is not a career offender because the two aggravated battery convictions are not crimes of violence. Both parties are free to argue and to present evidence about their respective positions at the sentencing hearing.

13

(h)     The defendant and his attorney and the government acknowledge that the above calculations are preliminary in nature and based on facts known to the government as of the time of this Agreement.  The defendant understands that the Probation Department will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Sentencing Guidelines calculation.  Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations.

9.     Errors in calculations or interpretation of any of the guidelines may be corrected by either party prior to sentencing.  The parties may correct these errors or misinterpretations either by stipulation or by a statement to the probation office and/or the Court setting forth the disagreement as to the correct guidelines and their application.  The validity of this Agreement will not be affected by such corrections, and the defendant shall not have a right to withdraw his plea on the basis of such corrections.

10.     Defendant understands the count to which he is pleading guilty carries a statutory minimum penalty of 10 years in prison, a maximum penalty of life imprisonment, and a maximum fine of $4,000,000. Defendant understands that this count also carries a term of supervised release of at least five years, and up to any number of years which the Court may specify, as well as any restitution which the Court shall order.

11.     The defendant understands that in accord with federal law, Title 18, United States Code, Section 3013, upon entry of judgment of conviction, the defendant will be assessed $100 on the count to which he has pled guilty, in addition to any other penalty

imposed. The defendant agrees to pay the special assessment of $100 at the time of sentencing with a check or money order made payable to the Clerk of the U.S. District Court.

12.    Defendant understands that by pleading guilty he surrenders certain rights, including the following:

(a)    If defendant persisted in a plea of not guilty to the charges against him, he would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by the judge sitting without a jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

(b)    If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously, considering each count separately, before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, and considering each count of the indictment separately, it was persuaded of defendant's guilt beyond a reasonable doubt.

(c)    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

(d)    At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them. In turn, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court.

(e)    At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

13.    Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraph. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial, and only may appeal the validity of this plea of guilty.

14.    Defendant is also aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed. Acknowledging this, the defendant knowingly waives the right to appeal any sentence within the maximum provided in the statute of conviction (or the manner in which that sentence was determined), in exchange for

16

the concessions made by the United States in this Plea Agreement. The defendant also waives his right to challenge his sentence or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

15.    Defendant understands that the second superseding indictment is a matter of public record and may be disclosed to any party.

16.    Defendant understands that the United States Attorney's Office will fully apprize the District Court and the United States Probation Office of the nature, scope and extent of defendant's conduct regarding the charge against him, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

17.    Defendant agrees he will fully and truthfully cooperate with the government in any matter in which he is called upon to cooperate.

(a)    Defendant agrees to provide complete and truthful information in any investigation and pre-trial preparation, and complete and truthful testimony, if called upon to testify, before any federal grand jury and United States District Court proceeding, and any related civil administrative or court proceeding.

(b)    Defendant agrees to postpone his sentencing until after the conclusion of his cooperation with the government.

18.    At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation, and, assuming the defendant's full and truthful cooperation, shall move the Court, pursuant to Sentencing Guideline §5K1.1 and 18 U.S.C. §3553(e), to depart from the advisory sentencing guidelines range and the statutory minimum sentence, if it applies. Defendant understands that the decision to depart from the advisory sentencing guidelines range and the statutory minimum sentence, if it applies, rests solely with the Court. However, this Plea Agreement is governed, in part, by Federal Rule of Criminal Procedure 11(c)(1)(C). That is, the parties have agreed that the Court shall sentence defendant to a term of imprisonment of 60% of the low-end of the sentencing guidelines range or 60% of the statutory minimum sentence of 120 months, whichever is higher. Other than the agreed term of imprisonment, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts and imposes the agreed term of incarceration set forth, defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(e). If, however, the Court refuses to impose the agreed term of incarceration set forth herein, thereby rejecting the Plea Agreement, or otherwise refuses to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound thereto and the Court shall afford the defendant the opportunity to then withdraw the plea of guilty, pursuant to Federal Rule of Criminal Procedure 11(d).

19.    The second superseding indictment charges that defendant is liable to the United States for approximately $750,000.00 in United States currency, which funds are

subject to forfeiture pursuant to Title 21, United States Code, Section 853, because these funds represent the proceeds of drug sales that occurred as a result of the violations alleged in Count One. By entry of a guilty plea to Count One of the second superseding indictment, defendant understands that the amount of $750,000.00 is subject to forfeiture.

20.    Defendant understands that his compliance with each part of this Plea Agreement extends throughout and beyond the period of his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Agreement. He further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute the defendant not subject to any of the limits set forth in this Agreement, or to resentence the defendant. The defendant understands and agrees that in the event that this Plea Agreement is breached by the defendant, and the Government elects to void the Plea Agreement and prosecute the defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

21.    Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

22.    After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the second superseding indictment as to this defendant.

23.    Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: October 18, 2005

PATRICK J. FITZGERALD
United States Attorney

RODNEY BEW
Defendant

RONALD DEWALD, Jr.
Assistant United States Attorney

GARETH MORRIS
Attorney for Defendant

20